UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

Evig, LLC,

    Plaintiff

v.

Mister Brightside, LLC, et al.,

    Defendants

Case No.: 2:23-cv-02051-JAD-NJK

**Order Denying Motion for Injunctive Relief and Granting Motion to Redact**

[ECF Nos. 16, 22]

    Plaintiff Evig, LLC, manufacturer of "Balance of Nature" fruit and vegetable supplements, sues Mister Brightside, LLC and its owners and affiliates for copying Evig's trade dress. Evig moves for a preliminary injunction halting the sale of Mister Brightside's supplements. Because Evig has not met the high burden to show a likelihood of success on the merits of its common-law trade-dress infringement claim, I deny its motion.[1]

**Background**

    Evig LLC sells fruit and vegetable supplements under the name "Balance of Nature" and claims that it has done so for approximately 20 years.[2] The company sells its "fruits" supplements in a red bottle with a red lid, and its "veggies" supplements in a green bottle with a green lid:

---

[1] After reviewing the parties' briefs, I find this matter appropriate for disposition without oral argument or hearing. L.R. 78-1.

[2] ECF No. 1-1 at 54 (amended complaint).

Evig contends that its product labels' distinctiveness stems from a combination of 18 details:

> (1) the original names of EVIG's products, (2) followed by the words "Fruits" and "Veggies," (3) its distinctive packaging of its Fruits and Veggies supplements together with its red bottle, red lid for Fruits supplement [and] the green bottle, green lid for the Veggies supplement, (4) the yellow lettering on the bottles, (5) its distinctive font use, (6) the use of the phrase "Whole Produce" above the words "Fruits" and "Veggies," (7) the layout of fruits and vegetables on the packaging, (8) incorporating a leaf to replace the letter "a" in "Nature," (9) its brand name located at the top center of the bottle, (10) the three formulated blends on the ingredients with the ingredients divided into separate blends, (11) the name of each respective blend, (12) the weights of the ingredients contained in each blend (720mg, 713mg, 576mg in the Veggies and 731mg, 719mg, and 561mg for the Fruits), (13) with 15 Veggies and 16 fruits . . . , (14) each bottle containing 90 capsules . . . , (15) with that information appearing at the bottom of the bottle, (16) the use of "Real Food," "Real Science," and "Real Nutrition," (17) pictures of whole fruits and vegetables on the labels, [and] (18) "Dietary Supplement."[3]

In 2022, Evig discovered that Mister Brightside, a new competitor doing business as Simply Nature's Promise, was selling fruit and veggie supplements on Amazon with packaging that Evig believes to be a rip-off of its own:



---

[3] *Id.* at 45–46.

In March 2022, Evig sent a cease-and-desist letter to Mister Brightside alerting the company to Evig's contention that its packaging infringed on Evig's trade dress.[4]  In response, Mister Brightside made some changes to its labeling, but that didn't satisfy Evig.[5]  Evig then sent another cease-and-desist letter that June, and Mister Brightside responded that it didn't believe it was infringing on Evig's trade dress.  So Evig filed suit, and the company now seeks injunctive relief for trade-dress violations of Nevada common law.[6]

## Analysis

**A.     Evig hasn't shown a likelihood of success on the merits to warrant injunctive relief.**

A preliminary injunction is an "extraordinary" remedy "never awarded as of right."[7]  The Supreme Court clarified in *Winter v. Natural Resources Defense Council, Inc.* that, to obtain an injunction, the plaintiff "must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable injury in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest."[8]  The Ninth Circuit recognizes an additional standard: if the "plaintiff can only show that there are 'serious questions going to

---

[4] *See* ECF No. 21-1 at ¶ 13.

[5] Mister Brightside changed its labels' font color from yellow to white, stopped using the phrase "whole produce," and may have changed the bottle color for its fruit supplements from red to orange.  *See id.*; ECF No. 26-5; ECF No. 26 at 7 (Evig's reply brief, contending—without evidentiary support—that Mister Brightside previously changed its fruit-supplement label from red to orange).  Evig is currently pursuing legal action against several other competitors with green and red bottles for trade-dress infringement, too.  *See Evig, LLC v. Nature's Nutra Co.*, Case No. 2:23-cv-00833-JCM-BNW; *Evig, LLC v. New Relief, LLC*, Case No. 2:24-cv-00065-RFB-BNW; *Evig, LLC v. Fantasy, Inc.*, 2:24-cv-00349-GMN-DJA; *Evig, LLC v. My Stellar Lifestyle Corp.*, 2:24-cv-00715-JCM-MDC.

[6] Evig's complaint contained several other claims, but I dismissed those earlier in this litigation.  And Evig's injunctive-relief motion relies on its trade-dress claim alone, so I analyze the merits of that claim only.

[7] *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

[8] *Id.* at 20.

the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of hardships tips *sharply* in the plaintiff's favor,' and the other two *Winter* factors are satisfied."[9]  Under either approach, the starting point is a merits analysis.

Evig brings its trade-dress claim under Nevada common law, but because the Supreme Court of Nevada hasn't explicitly recognized a common-law trade-dress claim or articulated a standard for such a claim, both parties analyze it under the federal Lanham Act.[10]  In cases like this, when "the state's highest court has not decided an issue, the task of the federal court is to predict how the state high court would resolve it."[11]  Because the Supreme Court of Nevada has previously looked to federal law to guide its common-law trademark-infringement analysis, I predict that it will do the same when addressing trade-dress claims.[12]

The Lanham Act protects against trade-dress infringement as a form of unfair competition.[13]  "[T]rade dress refers to the total image of a product and may include features such as size, shape, color, color combinations, texture[,] or graphics."[14]  "To prove trade[-]dress infringement, a plaintiff must demonstrate that (1) the trade dress is nonfunctional, (2) the trade dress [is inherently distinctive or] has acquired secondary meaning, and (3) there is a substantial

---

[9] *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)).

[10] The Supreme Court of Nevada has recognized common-law trademark-infringement claims generally.  *A.L.M.N., Inc. v. Rosoff*, 757 P.2d 1319, 1321 (Nev. 1988).  So I predict that it would likewise recognize Evig's trade-dress claim.

[11] *Ticknor v. Choice Hotels Int'l, Inc.*, 265 F.3d 931, 939 (9th Cir. 2001).

[12] *See generally A.L.M.N*, 757 P.2d 1319.

[13] 15 U.S.C. § 1125(a).

[14] *Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 822 (9th Cir. 1993) (cleaned up).

4

likelihood of confusion between the plaintiff's and defendant's products."[15]  "Trade dress is the composite tapestry of visual effects," so, courts must "focus *not* on the individual elements, but rather on the overall visual impression that the combination and arrangement of those elements create."[16]

### 1. *Likelihood of confusion*

To analyze the likelihood-of-confusion element in trade-dress cases, courts consider "the same factors used in the ordinary trademark context: strength of the trade dress, similarity between plaintiff's and defendant's trade dress, evidence of actual confusion, marketing channels used, type of goods and likely degree of purchaser care, and the defendant's intent in selecting its trade dress."[17]

#### a. *The parties' labels aren't that similar.*

Similarity of the parties' trade dress is "a critical question in the likelihood-of-confusion analysis."[18]  Mister Brightside contends that Evig's trade-dress claim fails on this factor alone because the appearance of the competing bottles is just too dissimilar.  "Of the eighteen elements purportedly comprising [Evig's] trade dress," Mister Brightside contends that "only half are even present" on its supplement labels.[19]  Mister Brightside's bottle uses (1) a different brand name,

---

[15] *Art Attacks Ink, LLC v. MGA Ent. Inc.*, 581 F.3d 1138, 1145 (9th Cir. 2009); *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 767 (1992) (holding that an inherently distinctive trade dress "is protectable . . . without a showing that it has acquired secondary meaning").

[16] *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1259 (9th Cir. 2001).

[17] *Adidas Am., Inc. v. Skechers USA, Inc.*, 890 F.3d 747, 755 (9th Cir. 2016) (cleaned up).

[18] *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 (9th Cir. 2000) (citing *Brookfield Commc'ns., Inc. v. West Coast Ent. Corp.*, 174 F.3d 1036, 1054 (9th Cir. 1999) (noting that "[t]he similarity of the marks will always be an important factor" because, if "the two marks are entirely dissimilar, there is no likelihood of confusion")).

[19] ECF No. 21 at 10.

(2) an orange instead of red bottle for its fruit supplements, (3) white instead of yellow lettering, (4) a different font, (5) 25 fruit ingredients and 18 veggie ingredients instead of Evig's respective 16 and 15, and (6) the phrase "made with whole food" below the words "fruits" and "veggies" instead of "whole produce" above those words.[20]  Mister Brightside admits that its label uses images of fruits and vegetables but contends that it lays them out differently than Evig's bottles. Mister Brightside's labels also don't incorporate a leaf into any lettering and don't use the phrases "real food," "real science," or "real nutrition."[21]  Mister Brightside also concedes that its supplements advertise three-ingredient "blends" that have the same net weight per blend as Evig's products, but it maintains that the ingredients that make up those blends are different and points out that both companies have changed the names of their blends since Evig initiated this lawsuit, so they are no longer the same.[22]

     As to the elements of these labels that are similar, Mister Brightside notes that they are not protectable as trade dress.  Evig claims that its packaging of the two supplements together and placing its brand name "at the top center of the bottle" are elements of its distinctive trade dress.  But Mister Brightside argues that selling fruit and veggie supplements as a set and placing a brand name on the top center of a bottle is hardly unique, pointing out that most supplement companies follow this tradition and Evig hasn't shown that these common marketing tactics can be protected.[23]  Evig also claims that its trade dress informs consumers that "each bottle

---

[20] *See id.* at 14–15.

[21] *Id.*

[22] *Id.* (noting that Evig "appears to now use Maintain, Fend, and Refresh, whereas [Mister Brightside] uses Simply Maintain, Simply Protect, and Simply Repair"); ECF No. 21-4 (images of the competing products' ingredient lists).

[23] *See* ECF No. 21-5 (screenshots of fruit-and-veggie supplements available from various distributors).

6

contain[s] 90 capsules" at the bottom of the bottle and uses the term "dietary supplement."[24]  But the FDA *requires* that supplements include both of those elements on their packaging.[25]

So at first glance, the products are similar in that they are both supplements that use the words "fruits" and "veggies," have pictures of said fruits and vegetables on the labels in different configurations, and use green labels on the veggie supplement.  But as a whole, Mister Brightside's packaging is largely dissimilar and doesn't share most of the elements that Evig identifies as comprising its trade dress.  Really, the similarity that Evig appears most concerned with is the color of the bottles and their caps—which is the only element of its trade dress that looks similar to Mister Brightside's packaging after "just a mere glance."[26]  At this stage, Evig has not shown that the labels are similar enough as a whole to tip this factor in its favor in a likelihood-of-success analysis.

### b. *Evig's actual-confusion evidence isn't strong enough to show a likelihood of success when weighed against the other factors.*

Evig has shown some evidence of consumer confusion in the form of Amazon reviews left for Mister Brightside's supplements, indicating that consumers bought that product believing it was Evig's.[27]  But Evig's small sample of Amazon reviews—approximately 10 out of at least 9,000 reviews of Mister Brightside's supplements—isn't statistically significant enough at this stage to show this actual-confusion factor should outweigh my hesitancy on the remaining

---

[24] ECF No. 1-1 at 45–46.

[25] *See* 21 C.F.R. § 101.7 ("The principal display panel of a food in package form [must] bear a declaration of the net quantity of contents . . . within the bottom 30 percent of the area of the label panel"); 21 C.F.R. § 101.3(g) ("Dietary supplements [must] be identified by the term 'dietary supplement'").

[26] ECF No. 26 at 2.

[27] ECF Nos. 16-7, 26-2.

factors.[28] As the Ninth Circuit explained in *Entrepreneur Media, Inc. v. Smith*, "[t]o constitute trademark infringement, use of a mark must be likely to confuse an *appreciable* number of people as to the source of the product." And 10/9,000 isn't an appreciable number. While Evig contends that it "has more" proof of actual confusion, this would have been the time to provide it. Because it failed to do so, Evig has not carried its burden to show that it is likely to prevail on the actual-confusion factor.

### c. Evig hasn't shown that consumers of vitamin products exercise a low degree of care or are likely to be easily confused by the labels' similarities.

To evaluate the consumer-care factor, courts "look at the type of good or service offered and the degree of care one can expect from the average buyer exercising ordinary caution."[29] Evig notes that "there is no evidence to suggest the degree of care used by purchasers, but based on the Amazon reviews, it is clear that consumers are being fooled by [Mister Brightside's] product."[30] Again, the number of reviews that Evig produces to show confusion isn't an appreciable number, especially when compared to the tens of thousands of reviews that each brand has collectively received.[31] Plus, several district courts have concluded that consumers buying products related to health and wellness tend to exercise higher-than-average degrees of care.[32] At this stage, Evig hasn't shown a likelihood of proving that an appreciable number of

---

[28] *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1151 (9th Cir. 2002).

[29] *La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*, 762 F.3d 867, 877 (9th Cir. 2014) (internal quotation omitted).

[30] ECF No. 16 at 20.

[31] *See* ECF No. 21-6 (screenshots of both products' Amazon pages, reflecting number of consumer reviews).

[32] *See, e.g.*, *Nature's Best, Inc. v. Ultimate Nutrition*, 323 F. Supp. 2d. 429, 434 (E.D.N.Y. 2004) (noting that "courts have acknowledged that consumers selecting products or treatments that affect their physical appearance and health are 'likely to exercise a great deal of care'" and

consumers interested in nutritional supplements, exercising a level of care commensurate with their level of interest in health products, would easily confuse Mister Brightside's product with Evig's, or that the handful of consumers who have been mistaken weren't outliers. So Evig hasn't met its burden to show a likelihood of success on this factor.

### d. *Evig hasn't demonstrated a likelihood of success on the merits as to the other trade-dress factors either.*

The remaining *Sleekcraft* factors—strength of the trade dress, marketing channels used, and the defendant's intent in selecting its trade dress—also don't support Evig's request for injunctive relief. As to strength, Evig merely states that its products are "famous" and that its trade dress is "extremely strong."[33] But it provides no evidence to support those characterizations. So I cannot find that Evig is likely to show that its trade dress is strong enough to deserve trademark protection.

The Ninth Circuit has recognized that "convergent marketing channels increase the likelihood of confusion."[34] But that court also acknowledges that this factor "becomes less important when the marketing channel is less obscure," noting that "today, it would be the rare commercial retailer that did not advertise online, and the shared use of a ubiquitous marketing

---

finding that consumers of nutritional supplements would similarly make "careful and informed" decisions when choosing between products); *Suja Life, LLC v. Pines Int'l, Inc.*, 2016 WL 6157950, at *12 (S.D. Cal. Oct. 24, 2016) (noting that consumers buying vegetable-forward juice beverages are educated, "health conscious[,] and environmentally aware shoppers" likely to "pay a premium for these nutrient-dense products" and are thus "more likely to exercise a higher degree of care"); *Eniva Corp. v. Glob. Water Sols., Inc.*, 440 F. Supp. 2d 1042, 1052 (D. Minn. 2006) (noting that "consumers in the niche wellness market likely use care when selecting health-based products" like liquid dietary supplements).

[33] ECF No. 16 at 19.

[34] *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 353 (9th Cir. 1979) (cleaned up).

9

channel does not shed much light on the likelihood of consumer confusion."[35]  While both companies advertise primarily on Amazon and through their own websites, those avenues can certainly be considered ubiquitous in the 21st century.  So I don't give much weight to this factor.

     Finally, Evig contends that Mister Brightside has shown that its intent in selecting its trade dress was to capitalize on the reputation of Evig's product.  It presents a report by a purported expert[36] who analyzed Evig's, Mister Brightside's, and several other companies' fruit and veggie supplements and concluded that it was statistically unlikely that the competitors developed their products "completely independent of Balance of Nature."[37]  But that expert didn't analyze the *trade dress* of these competing supplements; he analyzed the *ingredients* in them.[38]  Evig hasn't sufficiently explained how the ingredients—or any particular combination of ingredients—used in a product and printed on a bottle's "Supplement Facts" section are part of its products' trade dress.  A supplement's proprietary blend of ingredients may call for patent protection, but such ingredients don't involve the "size, shape, color, color combinations, texture, or graphics" that warrant protection through a trade-dress claim.[39]  And while Mister Brightside

---

[35] *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1151 (9th Cir. 2011) (cleaned up).

[36] This case is in its infancy, so the parties have not yet identified expert witnesses or supplied this court with the information necessary to determine if Evig's expert is qualified under the applicable standards.  For the purposes of this order, I assume without deciding that Evig's expert is so qualified.

[37] ECF No. 16-3 at 2.

[38] *Id.*

[39] *Int'l Jensen, Inc.*, 4 F.3d at 822; *see also* U.S. Patent & Trademark Office, *Trademark Manual of Examining Procedure* 807.02 (noting that "purely informational matter such as net weight, contents, or business addresses are generally not considered part of the mark" and shouldn't be included in photographs depicting a product's trade dress).  The court could not find any case

concedes that it looked at other products before bringing its supplement to market, any implied intent to copy Evig's trade dress in that statement doesn't outweigh the other *Sleekcraft* factors counseling against Evig's position.

Overall, while Evig has shown some evidence of actual confusion, it has not sufficiently shown that any of the other factors would likely weigh in its favor. Mister Brightside's packaging differs from Evig's in almost all key respects, with the only real issue seeming to be the use of wrap-around color labels and colored caps on its bottles. But that's not enough to hang a trade-dress claim on when almost all of the other elements of Evig's purported trade dress aren't present on Mister Brightside's bottles or, if they are present, it's because they are legally mandated. So I find that Evig hasn't shown a likelihood of success on the likelihood-of-confusion element.

### 2. *Inherent distinctiveness and secondary meaning*

To prevail on a trade-dress claim, a plaintiff must also show that its trade dress is either inherently distinctive or has secondary meaning.[40] A trade dress is inherently distinctive if its "intrinsic nature serves to identify a particular source of a product."[41] To determine whether a company's packaging in inherently distinctive, most courts apply the United States Court of Custom and Patent Appeals' test developed in *Seabrook Foods, Inc. v. Bar-Well Foods Limited*, asking (1) "whether [the design] was a common basic shape or design," (2) "whether it was unique or unusual in a particular field," (3) "whether it was a mere refinement of a commonly adopted and well-known form of ornamentation for a particular class of goods viewed by the

---

that considered the specific ingredients or ingredient blends in a product to be part of its trade dress.

[40] *Two Pesos, Inc.*, 505 U.S. at 770.

[41] *Id.* at 768.

public as a dress or ornamentation for the goods," or (4) "whether it was capable of creating a commercial impression distinct from the accompanying words."[42] The *Seabrook* factors are meant to ascertain "whether the design, shape[,] or combination of elements is so unique, unusual[,] or unexpected in this market that one can assume without proof that it will automatically be perceived by customers as an indicator of origin."[43]

Evig simply reiterates the *Seabrook* factors in its analysis, claiming that its trade dress "is not common, . . . is not a mere refinement of common ornamentation in the field and [] has created a commercial impression distinct from its accompanying words."[44] But Evig's conclusory recitation of the elements doesn't prove that they apply, and Evig doesn't present any competent evidence to support its statements. Nor does it provide any backup for its contention that consumers "know it's Evig's product" when they "see Evig's green and red bottles and their accompanying images, design, fonts, and colors."[45] And Mister Brightside responds with images of several competitors who use similar packaging elements (including bottle color, images of fruits and vegetables, and the words "Fruits" and "Veggies" centrally located on their labels) to argue that the composition of elements that Evig claims as unique is actually quite common.[46] Evig responds that those similar products are all imitating Evig's first-to-market packaging, but it again fails to provide competent evidence to back up that claim. In short, Evig hasn't shown that its combination of color scheme, graphic design, and font selection is so intrinsically unique that

---

[42] *Seabrook Foods, Inc. v. Bar-Well Foods Ltd.*, 568 F.2d 1342 (C.C.P.A. 1977) (cleaned up); *see also McCarthy on Trademarks & Unfair Competition* § 8:13 (4th ed. 2017) (collecting cases applying the *Seabrook* test).

[43] *McCarthy on Trademark* § 8:13.

[44] ECF No. 16 at 15.

[45] *Id.* at 16.

[46] *See* ECF No. 21-5.

it serves to identify the product's source.[47] So Evig has not met its burden to show that it is likely to prove inherent distinctiveness.

Of course, inherent distinctiveness is not the only way to prevail on this element: the plaintiff may also show that its trade dress has acquired secondary meaning. "Secondary meaning is a mental recognition in buyers' and potential buyers' minds that products connected with the trade dress are associated with the same source."[48] It "can be established in a variety of ways, including direct consumer testimony; survey evidence; exclusivity, manner, and length of use of mark; amount and manner of advertising; amount of sales and number of customers; established place in the market; and proof of intentional copying by the defendant."[49]

Evig states that Mister Brightside itself has shown that Evig has achieved secondary meaning because, in some of its advertising, Mister Brightside compares its product to a "Main Competitor" and includes images of red and green bottles to allude to, but not name, Evig or its Balance of Nature supplements.[50] Evig contends that this comparison shows both that Mister Brightside (1) knows Evig's packaging is so recognizable that consumers will know exactly who it is comparing itself against and (2) has intentionally copied Evig's labels for that reason.[51] But

---

[47] I am persuaded by the well-reasoned opinions of other district courts that have rejected inherent-distinctiveness arguments that similarly rely on design elements that highlight the product itself, not its source. *See, e.g.*, *Talavera Hair Prods. v. Taizhou Yunsung Elec. Appliance Co.*, 2021 WL 824768, at *4 (C.D. Cal. Mar. 4, 2021) (denying summary judgment on inherent-distinctiveness because "the packaging and arrangement of the [trade-dress] elements as a whole seem to merely describe the product, a hair tool, rather than the source, Talavera Hair Products, Inc." and collecting cases similarly holding that designs consisting of a "fairly routine color scheme, graphic layout, and choice of font" are not inherently distinctive).

[48] *Jason Scott Collection, Inc. v. Trendily Furniture, LLC*, 68 F.4th 1203, 1214 (9th Cir. 2023) (cleaned up).

[49] *Id.* (cleaned up).

[50] ECF No. 16 at 15 (citing ECF No. 16-5).

[51] *Id.*

1 Mister Brightside doesn't use Evig's complete trade dress in its comparative advertisements—it
2 uses only red and green bottles:

[comparative advertisement image: "WHY CHOOSE SIMPLY NATURE'S PROMISE" vs "MAIN COMPETITOR" comparison chart showing Simply Fruits and Simply Veggies bottles against red and green competitor bottles, with rows for Servings Per Container (30/30), Total Fruits & Vegetables (42/30), Cost Per Container ($39.95/$69.95), Cost Per Capsule ($0.44/$0.99), Vegan (✓/✓), Soy Free (✓/✗), Extra Antioxidants (✓/✗)]

Evig doesn't contend that its red and green bottles are distinctive enough to qualify as its trade dress without the other elements it lists in its complaint, so it's unclear how this evidence supports its position that its trade dress—with accompanying images, words, fonts, and secondary colors—has achieved secondary meaning. And aside from this advertisement of questionable evidentiary value, Evig presents no evidence to show that it can prove that its packaging has acquired secondary meaning.

In sum, Evig appears primarily concerned with Mister Brightside's use of colored labels that are reminiscent of Evig's color palette. But Evig hasn't shown that its trade dress as a whole is inherently distinctive or has acquired secondary meaning or that Mister Brightside's dissimilar design is likely to confuse an appreciable number of consumers.[52] I thus find that Evig hasn't shown a likelihood of success on—or serious questions concerning—the merits of its trade-dress claim, and I deny its motion for injunctive relief.

---

[52] Because Evig has failed to make an adequate showing on these two elements, I need not and do not consider whether Evig has shown that its packaging is not functional.

14

**B.     Mister Brightside has shown compelling reasons to redact Andrew Nashed's declaration.**

Mister Brightside moves to redact the declaration of its Chief Operating Officer Andrew Nashed. The declaration contains estimates of Evig's daily sales, and Mister Brightside assumes that Evig "would likely consider [those] numbers to be sensitive financial information."[53] Evig opposes, stating that it does consider its financial information to be confidential but arguing that the declaration should instead by struck by the court because the estimates that Nashed includes come from an unreliable source.[54]

First, Evig's affirmative request that the court strike Nashed's declaration should have been brought as a separate motion, not in opposition to Mister Brightside's motion to redact.[55] But even if Evig had properly moved to strike, I would have denied it as moot because I didn't rely on the declaration in my injunctive-relief analysis. So I consider only Mister Brightside's motion to redact, and find that Evig doesn't truly oppose that request since it agrees that Nashed's estimates should remain sealed.[56]

"The public has a 'general right to inspect and copy public records and documents including judicial records and documents.'"[57] "Although the common law right of access is not

---

[53] ECF No. 22 at 2.

[54] ECF No. 27 at 2.

[55] *See* L.R. IC 2-2(b) ("For each type of relief requested or purpose of the document, a separate document must be filed and a separate event must be selected for that document."). Evig also contends that "there is additional good cause to sanction [Mister Brightside] and to award attorney's fees to Evig," ECF No. 27 at 4, but that request also wasn't properly brought before the court, so I don't consider it.

[56] *See* ECF No. 27 at 4 (stating that "there is good cause to seal the estimates as they are not entirely accurate").

[57] *In re Midland Nat. Life Ins. Co. Annuity Sales Pracs. Litig.*, 686 F.3d 1115, 1119 (9th Cir. 2012) (quoting *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978)).

absolute, '[courts] start with a strong presumption in favor of access to court records.'"[58] "A party seeking to seal judicial records can overcome the strong presumption of access by providing 'sufficiently compelling reasons' that override the public policies favoring disclosure."[59] "When ruling on a motion to seal court records, the district court must balance the competing interests of the public and the party seeking to seal judicial records."[60]

"To seal the records, the district court must articulate a factual basis for each compelling reason to seal[,] [which] must continue to exist to keep judicial records sealed."[61] The Ninth Circuit has, however, "'carved out an exception to the presumption of access' to judicial records" that is "'expressly limited to' judicial records 'filed under seal when attached to a non-dispositive motion.'"[62] "Under the exception, 'the usual presumption of the public's right is rebutted[,]'" so "a particularized showing of 'good cause' under [FRCP] 26(c) is sufficient to preserve the secrecy of sealed discovery documents attached to non-dispositive motions."[63]

I find that the higher compelling-reasons standard applies in this context because the underlying motion is dispositive as it addresses the merits of this action. I've reviewed Nashed's unredacted declaration in camera and conclude that there are compelling reasons to seal the exhibit and permit a lightly redacted version—excising Evig's confidential financial information—to be available on the public docket. I am satisfied that releasing the information

---

[58] *Id.* (quoting *Foltz v. St. Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003)).
[59] *Id.* (quoting *Foltz*, 331 F.3d at 1135).
[60] *Id.* (citing *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1179 (9th Cir. 2006)).
[61] *Id.* (citing *Kamakana*, 447 F.3d at 1179; *Foltz*, 331 F.3d at 1136).
[62] *Id.* (quoting *Foltz*, 331 F.3d at 1135).
[63] *Id.* (quoting *Phillips ex rel. Estates of Byrd v. Gen. Motors Corp.*, 307 F.3d 1206, 1213 (9th Cir. 2002); *Foltz*, 331 F.3d at 1135, 1138).

16

contained in the unredacted declaration could potentially damage the parties, so I grant Mister Brightside's motion to seal and redact.

**Conclusion**

IT IS THEREFORE ORDERED that Evig LLC's motion for injunctive relief **[ECF No. 16] is DENIED**.

IT IS FURTHER ORDERED that Mister Brightside, LLC's motion to redact **[ECF No. 22] is GRANTED**. **The Clerk of Court is directed to MAINTAIN THE SEAL on ECF No. 23**.

_____
U.S. District Judge Jennifer A. Dorsey
May 2, 2024